**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| Phillip S. Morales, *et al.*, | |
| Plaintiffs, | Civil Action No. 1:04-CV-01044 |
| | JUDGE: Hon. Tanya S. Chutkan |
| v. | |
| Intelsat Global Service Corp., et al., | |
| Defendants. | |

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION TO ENFORCE THE CONSENT DECREE AND FOR A PRELIMINARY INJUNCTION AND IN OPPOSITION TO PLAINTIFFS' <u>SUPPLEMENTAL MOTION FOR DIRECTIVE TO NEUTRAL EXPERT</u>**

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... ii

PRELIMINARY STATEMENT ................................................................................... 1

BACKGROUND ......................................................................................................... 6

LEGAL STANDARD.................................................................................................. 12

ARGUMENT .............................................................................................................. 14

I.      THE PLAINTIFFS FACE NO RISK OF HARM, AND CERTAINLY NO
        RISK OF IRREPARABLE HARM .............................................................. 14

II.     THERE IS A REAL RISK OF IRREPARABLE HARM TO THE NON-
        OBJECTING RETIREES, AND TO INTELSAT ........................................ 21

III.    PLAINTIFFS CANNOT SHOW A LIKELIHOOD OF SUCCESS ON THE
        MERITS UNDER EITHER THE NORMAL PRELIMINARY INJUNCTION
        STANDARD OR THE HIGHER STANDARD APPLICABLE HERE.......... 22

A.      The Permissibility of the Proposed Change Must be Judged by a Neutral
        Expert But, In Any Event, Plaintiffs Have Not Made a Sufficient Showing that
        the Proposed Change Will Be Disallowed........................................................ 23

B.      Plaintiffs' Remaining Claims Alleging Hyper-Technical Violations Also Do
        Not Withstand Scrutiny.................................................................................... 27

IV.     PLAINTIFFS ENTIRELY FAIL TO ADDRESS THE PUBLIC INTEREST ................ 30

V.      THE COURT SHOULD REJECT PLAINTIFFS' COUNSEL'S OBVIOUS
        EFFORTS TO POISON, OBSTRUCT, AND DELAY THE NEUTRAL
        EXPERT'S REVIEW ................................................................................... 31

CONCLUSION............................................................................................................ 37

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Baker DC v. Nat'l Labor Relations Bd.*,
  102 F. Supp. 3d 194 (D.D.C. 2015) .............................................................13, 15, 17

*Barton v. Venneri*,
  No. 05-cv-0669(JDB), 2005 WL 1119797 (D.D.C. May 11, 2005) .......................14

*Biovail Corp. v. U.S. Food & Drug Admin.*,
  448 F. Supp. 2d 154 (D.D.C. 2006) ......................................................................20

*Book v. Robert Half Int'l, Inc.*,
  413 F.3d 77 (D.C. Cir. 2005) ................................................................................31

*Brink's, Inc. v. Bd. of Governors of Fed. Reserve Sys.*,
  466 F. Supp. 112 (D.D.C. 1979) ...........................................................................12

*Brown v. D.C.*,
  888 F. Supp. 2d 28 (D.D.C. 2012) ........................................................................15

*Carabillo v. ULLICO Inc. Pension Plan & Tr.*,
  355 F Supp. 2d 49 (D.D.C. 2004) ....................................................................16, 20

*Combs v. Snyder*,
  101 F. Supp. 531 (D.D.C. 1951) ...........................................................................12

*Cornish v. Dudas*,
  540 F. Supp. 2d 61 (D.D.C. 2008), *aff'd sub nom. Cornish v. Doll*, 330 F.
  App'x 919 (Fed. Cir. 2009) ...............................................................................19, 30

*Davis v. Billington*,
  76 F. Supp. 3d 59 (D.D.C. 2014) ..........................................................................26

*Davis v. Pension Ben. Guar. Corp.*,
  571 F.3d 1288 (D.C. Cir. 2009) ............................................................................19

*Gomez v. Kelly*,
  237 F. Supp. 3d 13 (D.D.C. 2017) ...................................................................13, 30

*Gov't of Jamaica v. 1201 29th St., N.W. Tenants Ass'n, Inc.*,
  No. 92-cv-0836(JHG), 1992 WL 84908 (D.D.C. Apr. 7, 1992) .............................30

*Gulf Oil Corp. v. Dep't of Energy*,
  514 F. Supp. 1019 (D.D.C. 1981) .........................................................................15

*Guttenberg v. Emery*,
  26 F. Supp. 3d 88 (D.D.C. 2014) ................................................................. *passim*

*Heart 6 Ranch, LLC v. Zinke*,
  285 F. Supp. 3d 135 (D.D.C. 2018) ...............................................................20

*Hispanic Affairs Project v. Perez*,
  141 F. Supp. 3d 60 (D.D.C. 2015) .................................................................14

*Howard Town Ctr. Developer, LLC v. Howard Univ.*,
  278 F. Supp. 3d 333 (D.D.C. 2017) ...............................................................29

*Jack's Canoes & Kayaks, LLC v. Nat'l Park Serv.*,
  933 F. Supp. 2d 58 (D.D.C. 2013) .................................................................20

*Katz v. Georgetown Univ.*,
  No. 00-cv-2412, 2000 WL 33539394 (D.D.C. Nov. 6, 2000), *aff'd*, 246 F.3d
  685 (D.C. Cir. 2001) ................................................................................21, 22

*Keystone Driller Co. v. Gen. Excavator Co.*,
  290 U.S. 687 (1942) .........................................................................................12

*Mexichem Specialty Resins, Inc. v. Envtl. Prot. Agency*,
  787 F.3d 544 (D.C. Cir. 2015) ........................................................................15

*Miniter v. Moon*,
  684 F. Supp. 2d 13 (D.D.C. 2010) ......................................................12, 14, 30

*Morales v. Intelsat Global Service Corp.*,
  Case No. 1:04-cv-1044-GK, Dkt. 107 (D.D.C. Aug. 22, 2012) ................13, 14, 28

*N. Air Cargo v. U.S. Postal Serv.*,
  756 F. Supp. 2d 116 (D.D.C. 2010) ...........................................................15, 19

*Nat'l Assoc. for Fixed Annuities v. Perez*,
  219 F. Supp. 3d 10 (D.D.C. 2016) ..................................................................21

*Penland v. Mabus*,
  643 F. Supp. 2d 14 (D.D.C. 2009) ..................................................................16

*Seeger v. United States Dep't of Def.*,
  306 F. Supp. 3d 265 (D.D.C. 2018) ................................................................22

*Sherley v. Sebelius*,
  644 F.3d 388 (D.C. Cir. 2011) ........................................................................12

*Spadone v. McHugh*,
  842 F. Supp. 2d 295 (D.D.C. 2012) ................................................................13

*Sterling Commercial Credit-Michigan, LLC v. Phoenix Indus. I, LLC*,
762 F. Supp. 2d 8 (D.D.C. 2011) ...................................................................................15, 17

*Synanon Found., Inc. v. Bernstein*,
503 A.2d 1254 (D.C. 1986) ..........................................................................................12

*Taylor v. Resolution Tr. Corp.*,
56 F.3d 1497 (D.C. Cir. 1995) ................................................................................15, 19

*United States v. Armour & Co.*,
402 U.S. 673 (1971)......................................................................................................37

*United States v. Microsoft Corp.*,
147 F.3d 935 (D.C. Cir. 1998).................................................................................13, 23

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008)....................................................................................................12, 13

*Wis. Gas Co. v. Fed. Energy Regulatory Comm'n*,
758 F.2d 669 (D.C. Cir. 1985) ............................................................................15, 16, 17

## PRELIMINARY STATEMENT

This action relates to the Intelsat Qualifying Retiree Group Health Plan (the "Wrap Around Plan"), the current Component Benefit Programs provided under the Wrap Around Plan (the "Intelsat Plan"), and Intelsat's proposed change to the Component Benefit Programs (the "Proposed Change").

Plaintiffs' Motion for a Preliminary Injunction (the "Motion") is predicated on the claim that Plaintiffs – the objecting retirees – "face the prospect of losing their health insurance," or will pay more for their medical and drug coverage under the Proposed Change than they currently do. (Pls. Mot. at 11.) The former proposition is wholly false, while the latter is also false but, even if true, represents "harm" that would be fully compensable in dollars (*i.e.*, not irreparable). Moreover, all of these propositions are based solely on Plaintiffs' counsel's "say so". Neither Plaintiffs' Motion nor its two "supplemental" motions are supported by a single affidavit or other competent evidence sufficient to support Plaintiffs' extraordinary requests for preliminary injunctive relief, and/or Plaintiffs' request for an unprecedented judicial intervention in an arbitration process by which a neutral expert has exclusive jurisdiction the parties reserved for it.

Plaintiffs' counsel's hollow statements to the contrary notwithstanding, there is simply no "great," "imminent," or "irreparable" harm here – the bedrock pre-requisites for a preliminary injunction. The Proposed Change to the current benefits will not even go into effect until January 1, 2019. Between now and the end of the year, everything *remains exactly the same* regarding the Objecting Retirees' medical insurance.

Nor is it correct to say that once the Proposed Change goes into effect next year, Objecting Retirees will "lose[] their health insurance." Under the Proposed Change, retirees will

1

*continue to be covered by Medicare as their primary insurance.* But, instead of using the current Intelsat Plan as secondary (gap filling) insurance behind their Medicare insurance, Intelsat will provide the retirees with funds – through a tax-advantaged Health Retirement Arrangement ("HRA") – to purchase their secondary or supplemental insurance (also known as "Medigap" or Medicare Advantage insurance) on the individual market. Under the Proposed Change, retirees will enjoy the *same* gap coverage that *millions* of elderly Americans now have and, importantly, comparable to what the retirees themselves now have. Indeed, it is abundantly clear from Plaintiffs' Motion that their true complaint is the allegedly higher premiums and drug costs they believe they will pay. Not only have Plaintiffs "gotten the math wrong," but, even if they were correct, such alleged harm is obviously compensable monetary damage, which is wholly insufficient to support entry of a preliminary injunction.

Per the terms of the Wrap Around Plan, Intelsat may make "any modification" to the Intelsat Plan provided that the change "not reduce the value of the Medical Benefits, *taken as a whole*, below the value of the Medical Benefits, taken as a whole as of the Effective Date [November 2007]." Intelsat retained Willis Towers Watson ("WTW"), a nationally recognized health advisory consulting and actuary firm, to help it develop the Proposed Change and *to ensure that it met this standard*. Intelsat retained a *second* nationally known consulting firm, Mercer (U.S.) Inc., to independently review WTW's work and confirm WTW's conclusion before rolling out the Proposed Change.

Aside from its lack of irreparable harm, Plaintiffs' Motion is also premature and improper. The Wrap Around Plan contains its own mandatory arbitration procedure, which requires that the permissibility of any proposed change be assessed by a Neutral Expert – specifically, an actuary "knowledgeable in medical benefits matters." Per Section 7 of the Wrap

Around Plan, the Neutral Expert must "utiliz[e] his/her own expertise and generally accepted actuarial and valuation principles for valuing medical benefit programs." If the Neutral Expert decides that the new benefits are, as a whole, *not* of equal or greater value to that which the retirees now have, then the Proposed Change will not go into effect. Retirees would thus remain on the current Intelsat Plan, without change, and *the pending motion will become moot*. Any retiree that has already signed up for a new plan will be dis-enrolled in the new plan and re-enrolled in the Intelsat Plan, at no penalty to them. But, if (as we expect) the Neutral finds in Intelsat's favor (*i.e.*, that the comparability in value as a whole standard has been met), then Section 7.5 directs that the Proposed Change "*may be implemented*." Any individual issues one or more retirees may have with the Proposed Change (*e.g.*, if their individual premiums are higher than permitted under Section 5) must, therefore, be brought as damage claims.

The neutrals proposed by both parties have both said, in writing, that they can render their decision by late November – which is well in advance of the January 1, 2019 implementation date. Insofar as Plaintiffs' counsel said Plaintiffs would reject *any* neutral that Intelsat proposed, Intelsat advised Plaintiffs' counsel last Monday (October 29th) that Intelsat *accepted* the Neutral Expert that Plaintiffs proposed (*i.e.*, Roger Burton). Intelsat did this because, otherwise, there would be a substantial delay, as the American Arbitration Association would have to pick among the two neutrals the parties proposed.

Plaintiffs' claim that no one other than Intelsat will be harmed by issuance of an injunction also is flatly untrue. While there are 168 Objecting Retirees,[1] Plaintiffs' Motion fails to disclose that there are *266 retirees who have not objected to the Proposed Change and are not Plaintiffs here, but yet will lose out* if the Proposed Change is enjoined. Intelsat has

---

[1] Plaintiffs' list of "169" objecting retirees includes one duplicate. The list also include five retirees not subject to the Proposed Change (*i.e.*, retirees living outside of the United States or who are not yet 65 years old).

modeled an average and median annual *savings* across *all* retirees of approximately $1,150 under the Proposed Change – that is over $300,000 in lost value to the non-objectors alone.  In fact, the risk of the ***non-objecting majority*** losing out is irreversible.  The objecting ***minority*** will not make the non-objecting majority whole for those lost savings should they obtain a Preliminary Injunction and later lose this action – nor will they make Intelsat whole for the millions of dollars lost from a balance sheet liability and cash flow perspective.

In sum, Plaintiffs will continue to have health insurance coverage in 2019, with no lapse in supplemental coverage.  Their supplemental coverage will be comprehensive, or at least comparable to what they now receive.  Plaintiffs should realize savings, not higher costs.  But if any Plaintiffs do experience higher costs, they can maintain a damage claim against Intelsat; they would not have a claim for injunctive relief, as money damages are not irreparable.

Finally, as to the most recent Supplemental Motion by Plaintiffs, which seeks to have this Court instruct the Neutral Expert/arbitrator as to how he must select a sample population for his actuarial analysis and/or otherwise go about doing his actuarial valuation, it is an obvious and improper effort to obstruct, delay, poison, and circumvent the agreed-to process for having an actuary/health expert arbitrate the critical issue for this matter:  whether a Proposed Change may be implemented by virtue of it meeting (or not meeting) the "as a whole" actuarial valuation standard contained in Section 7.  Indeed, even before Plaintiffs' counsel made that Motion, he incredibly took it upon himself to send each side's proposed neutral a 14-question, written inquisition (containing inaccurate assumed facts) that effectively posed substantive questions to the prospective neutrals as to "how will they" conduct their analysis and interpret the agreement – similar to the *voir dire* of a juror, except going well beyond it and improperly seeking a preview of their opinions on the very matter in dispute (*e.g.*, "How will you account

4

for the fac [sic], and quantity [sic] a value for the fact, that the Via Benefits plan give no coverage of medical providers who do not take Medicare, but the United Healthcare plans do?  Will you look at the current retirees medical providers and see which do not take Medicare?").  While counsel can and should discuss the merits with an arbitrator *after* he/she is appointed, counsel is *not* allowed to have those discussions with a neutral arbitrator *before* he/she even is selected.

Not liking their initial responses, Plaintiffs' counsel now incredibly maligns them – including his *own nominated neutral* – for being "so eager to get to work" that they allegedly are not "paying attention" to the Plan requirements.  Plaintiffs' counsel's obvious intent is to poison the well and dictate the way actuarial principles must be applied by the Neutral Expert.  He is now seeking the Court's assistance in doing so by asking the Court to pose questions to the Neutral and to direct the process of the Neutral's actuarial analysis.  Indeed, Plaintiffs' request goes so far as to ask *the Court* to direct *the expert* on the proper method for selecting a representative population.  None of this unprecedented intervention in a matter within the exclusive jurisdiction of an arbitrator is authorized by Section 7, or the law.

Most recently, shortly after Intelsat already agreed to forego *its* preferred neutral and accepted *Plaintiffs' own* nominated neutral (Mr. Burton), Plaintiffs' counsel said he now withdraws his "agreement" to Mr. Burton and maintains that Mr. Burton's designation as the Neutral is now "*void*" – completely upending the Neutral Expert arbitration.  Plaintiffs' counsel did so based not on any concerns with Mr. Burton's background or qualifications, or anything else specific to Mr. Burton, but rather because Intelsat would not acquiesce to Plaintiffs' unreasonable demand that Plaintiffs be given veto power over materials Intelsat wished to provide to the Neutral for his review and analysis.  No party in an arbitration gets to dictate the

content of the other party's submissions to the arbitrator.  And, nothing in the Wrap Around

Plan, or law, supports such a remarkable veto power.

Plaintiffs' Motion for Directive to the Neutral Expert should be denied as well, as an

unwarranted and unprecedented intrusion into matters (and expertise) committed to the exclusive

jurisdiction of an arbitrator.  The only "instructions" needed here should be directed to Plaintiffs'

counsel himself to stop interfering with the Neutral process and to let Mr. Burton go ahead and

do his job.

## BACKGROUND

Intelsat summarizes below the key background facts.  For a more complete background,

the Court is respectfully directed to the accompanying Declarations of:  Wesley Altman, Intelsat

US LLC's Benefits Manager; Sudhakar Natarajan, Senior Director and Actuary at Willis Towers

Watson; and John Calandra, Intelsat's counsel.

The Wrap Around Plan is the result of a lawsuit settlement and the entry of a 2007

Consent Decree that incorporated the Wrap Around Plan by reference.  It is a contract, executed

by and between Intelsat and almost 500 of its retirees.  These retirees have relatively rich pension

plans from Intelsat.  They are *not* the indigent folks that Plaintiffs' Motion at times tries to

portray them to be.  (Declaration of W. Altman ("Altman Decl.") ¶ 12.)

Recognizing that health care methods and delivery systems do not remain static over

time, the Wrap Around Plan allows Intelsat to implement changes to the medical benefits

otherwise provided for in the underlying "Component Benefit Plans" (*i.e.*, Appendix A to the

Wrap Around Plan) (*Id.* ¶ 16.)  For example, the very first page of the Wrap Around Plan states:

> The Plan provides Medical Benefits to Covered Persons through the Component
> Benefit Programs listed in Appendix A attached hereto, and each of these
> Component Benefit Programs is specifically incorporated into the Plan by this
> reference.  ***Subject to the terms and procedures described in Section 7 hereof,***

> *Appendix A may be changed from time to time without formal amendment of this Plan document*.

(Altman Decl. Ex. 1 at 1 (emphasis added); *see also id.* at 2, 7; §§ 4.3, 5.1(C), 7.3, 7.5, 8.6.)

In short, the key to any proposed change by Intelsat is that the company comply with Section 7, which includes both procedural and substantive requirements for a Proposed Change.

### The Procedural Requirements Were Met and the Vast Majority of Retirees Have Not Objected to the Proposed Change

A "Proposed Change" is defined to be "any modification" of the medical benefits.   In connection with a Proposed Change, Intelsat must send a written notice to each of the Eligible Retirees (collectively, the "Notice Group") at least 90 days in advance of the effective date of the Proposed Change.  (Altman Decl. Ex. 1 §§ 7.3(A), (B)(1) – (2).)  The notice must contain a detailed explanation of the Proposed Change and an analysis demonstrating that the benefits, taken as a whole, have not been reduced below the level in place as of the effective date – November 1, 2007.  (*Id.* § 7.3(B)(3).)

The purpose of the notice is to permit retirees to determine whether they have initial objections to the change (Altman Decl. ¶ 23), and if a sufficient number of written objections are received, Intelsat is then required to hold a meeting with the Objecting Retirees and the Intelsat Director of Human Resources (Altman Decl. Ex. 1 § 7.3(D).)

On September 3, 2018, Intelsat sent a detailed, 10-page notice letter to the Notice Group and their counsel, Lawrence Postol, outlining the Proposed Change (the "Notice").  (Altman Decl. ¶ 19 & Ex. 3.)  Mr. Postol confirmed receipt of the Notice on September 5, 2018 – *six weeks prior* to filing the motion for preliminary injunction.  (*Id.* ¶ 22 & Ex. 4.)

The Notice indicated that the Proposed Change will go into effect on January 1, 2019 (*i.e.*, well more than the 90 days' notice required by section 7.3(B)(1)).  The Notice further explained, *inter alia*, that "[u]sing an actuarial analysis, the [Proposed Change] was designed so

as not to reduce the value of the benefits currently offered under the program" and pointed

retirees to review the Appendix thereto, which contained an actuarial analysis prepared by WTW

of how a "low utilizer," "average utilizer" and "high utilizer" will fair under the Proposed

Change as compared to the current Intelsat Plan.  (Altman Decl. Ex. 3 at 2, 7-9.)  The Notice also

provided several charts, one of which (on page 3), tracked some of the very Section 7

requirements that Plaintiffs now seem to argue were violated.

     The Notice announced in-person informational sessions, which were held on September

11 and 13, 2018, and retirees also were directed to the Via Benefits website hosted by WTW.

(Altman Decl. ¶ 21.)  The website provides retirees with an Enrollment Guide, a 24-page

Frequently Asked Questions document, a video presentation, a personalized Shop and Compare

option (where they can now download plan benefit documents), and a telephone hotline number

that lets them speak with a licensed benefit advisor. (*Id.*)

     By September 27, 2019, Intelsat had received more than 30 form objection letters – all

from retirees represented by Mr. Postol – and the parties' agreed to hold the required meeting on

October 16, 2018.  (Altman Decl. ¶ 24.)  Retirees who chose not to attend, or were unable to

attend, in person were provided with a call-in number and a Webex type link to view the

presentation.  (*Id.* ¶ 25.)  The presentation materials were subsequently provided to the objecting

retirees through their counsel.  (*Id.*)

     Finally, because a sufficient number of objections were received, the Wrap Around Plan

provides that "the matter of whether or not the Proposed Change reduces the value of the

Medical Benefits, taken as a whole ***shall be referred for decision to the Neutral Expert, whose***

***decision is final and binding***."  (Altman Decl. Ex. 1 § 7.3(E)) (emphasis added).  The Neutral

Expert is instructed to use "the standards and methodologies set forth in this Section 7" and to

"utilize his/her own expertise and generally accepted actuarial and valuation principles for valuing medical benefit programs."  (*Id.* §§ 7.4, 7.5).  The Neutral Expert process is discussed more fully in Section V, below.

**<u>Two Actuarial Firms Already Have Independently Confirmed that The Substantive Requirements of the Plan Were Met, and a Neutral Expert Will Soon Conduct a Third Review</u>**

The permissibility of a Proposed Change will be judged by "whether or not [it] reduces the value of the Medical Benefits, *taken as a whole*[.]"  (Altman Decl. Ex. 1 § 7.4) (emphasis added).  There is no requirement that the Proposed Change have *no* negative impact on *any* retiree or any subset of retirees.  Rather, the value is to be measured on the entire retiree group "taken as a whole."  (Altman Decl. ¶ 26; Declaration of S. Natarajan ("Natarajan Decl.") ¶ 22.)

Intelsat retained premier actuarial firm, Willis Towers Watson ("WTW"), to help design the Proposed Change and to do so in a way that met the Wrap Around Plan's requirements.  (Altman Decl. ¶¶ 2, 11.)  Before rolling out the Proposed Change to retirees, Intelsat had a *second* actuarial firm, Mercer (U.S.) Inc., review WTW's work and independently confirm that it met the required standard.  (*Id.* ¶ 11.)

Under the current Intelsat Plan, Intelsat subsidizes the cost of insurance coverage and retirees pay a portion of the cost to Intelsat.  For 2018, most retirees paid Intelsat $615 for their health insurance.  (Altman Decl. ¶ 27.)  Under the Proposed Change, Intelsat will continue to subsidize the cost of the Eligible Retirees' coverage, however, it will do so through contributions to tax-free Health Reimbursement Arrangements ("HRA") for each Eligible Retiree.  Retirees will no longer pay Intelsat the $615 in premium.   Rather, they will use that money, plus the funds in their HRA, to purchase a medical coverage plan, prescription drug plan, and dental and vision plans.  (*Id.*)  Essentially, rather than Intelsat purchasing this coverage directly on the retirees' behalf, Intelsat will provide the retirees with sufficient funds to allow them to select and

purchase for themselves the coverage they prefer given their unique health care needs.  (*Id.*)
This is a "win/win" proposition because it allows the parties to take advantage of the lower
premium costs offered in the marketplace (due to an ability to spread costs and risks over a
greater population).  (*Id.* ¶ 10.)  Many employers today are doing this very same thing:  moving
from company-sponsored group health plans to HRAs that allow retirees to pick individual plans
in the marketplace that are best suited for their health needs. (*Id.*; Natarajan Decl. ¶ 10.)

The amount of the HRA for covered retirees was determined by Intelsat in conjunction
with WTW, and was intended to make them at least whole, if not give them a substantial savings.
The Proposed Change does *not* apply to retirees who are not yet eligible for Medicare and/or
who live abroad.   As to the remainder, of which there are approximately 434, they and their
covered spouses will each receive an HRA of at least $4,325 per year.  (Altman Decl. ¶ 30.)
This amount, plus the approximately $615 each individual already pays towards his or her
coverage, gives each retiree and spouse almost $5,000 of "buying power," which they will use to
purchase coverage in the individual marketplace through Via Benefits.  (*Id.* ¶ 31.)  Retirees and
spouses in more expensive geographic markets will receive higher HRAs.  (*Id.*)  For example,
those living in Miami will receive an HRA of $5,880.  Any unused HRA amounts are allowed to
roll-over to subsequent years, and also may be used to pay currently unreimbursed expenses that
retirees now pay out of their own pockets (*e.g.*, Medicare Part B premiums, eye glasses, hearing
aids, etc.).  (*Id.*)

Intelsat and WTW took into account a number of other factors specifically to ensure that
the Proposed Change would not reduce the value of the medical benefits, taken as a whole.  For
example, the HRA amount was designed to permit retirees to purchase the most comprehensive
supplemental health plan available on the market, Medigap Plan F, which also happens to be the

supplemental Medicare plan that the ***majority*** of elderly Americans select.  (Altman Decl. ¶ 33; Natarajan Decl. ¶ 29.)  Plan F is comparable to the current Plan and, in many ways, it is better. Unlike the current Plan, Plan F has *no* out-of-pocket costs, *no* co-pays, *no* co-insurance, and *no*-deductibles.  (Natarajan Decl. ¶¶ 26-27.)  Retirees will be able to see any medical provider that accepts Medicare (approximately 95% of all medical providers in the country), as well as providers that do not accept Medicare but nonetheless accept Plan F – which brings the coverage to about 98% of all providers nationally.  (*Id.* ¶¶ 26, 28.)  Gone are the "in" versus "out" of network distinctions that exist under the current plan.

Intelsat also paid special attention to prescription drug coverage and to ensuring that costs and coverage are comparable to the current Intelsat Plan.  (Altman Decl. ¶ 34.)  Intelsat designed the Proposed Change to include *three* special reimbursements provisions for the minority of retirees who could otherwise end up paying more for their prescription drugs under the Proposed Change (*i.e.*, Part D plan) than they do under the current plan.  (Natarajan Decl. ¶ 32.)  These extra reimbursement payments – referred to as the co-pay reimbursement, the "donut hole" reimbursement, and the "catastrophic stage" reimbursement – will typically be received by retirees ***within one to two weeks*** of the retiree's outlay (for the large "donut hole" and "catastrophic" reimbursements), and at year's end for the smaller co-pay reimbursement. (Altman Decl. ¶ 34; *see also id.* Ex. 3 at 4 (describing payments).)  Together, these reimbursements will make whole any retiree who may otherwise have ended up paying more for his/her drug costs.

Intelsat has modeled an average and median annual savings across all retirees of approximately $1,150 under the Proposed Change.  (Natarajan Decl. ¶ 21.)  Put another way, Intelsat expects that the average (and also median) cost for retirees to purchase medical,

prescription drug, and vision/dental coverage through Via Benefits will be approximately $3,850 of the $5,000 tax-free dollar retirees have to spend (and remaining amounts roll-over and/or may be used for currently unreimbursed costs).  (*Id.*; Altman Decl. ¶¶ 31, 36.)  These individual savings are an added bonus to the retirees, as Intelsat was only required to – and did – ensure that the Proposed Change does not reduce the value of the medical benefits, taken as a whole.

## LEGAL STANDARD

"A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)); *Miniter v. Moon*, 684 F. Supp. 2d 13, 15 (D.D.C. 2010) (a preliminary injunction "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." (emphasis in original)). And "[n]othing is better settled than that it is within the discretion of a court of equity to deny its aid to **one who does not come into court with clean hands**."  *Combs v. Snyder*, 101 F. Supp. 531, 532 (D.D.C. 1951) (emphasis added) (denying motion for preliminary injunction); *see also Brink's, Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 466 F. Supp. 112, 116 (D.D.C. 1979) (plaintiff estopped from obtaining preliminary injunction by the doctrine of unclean hands).  *Cf. Synanon Found., Inc. v. Bernstein*, 503 A.2d 1254, 1264 (D.C. 1986) ("The equitable powers of th[e] court can never be exerted in behalf of one who has acted fraudulently or who by deceit or any unfair means has gained an advantage." (alteration in original) (quoting *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 687 (1942))).

The party seeking a preliminary injunction must show "(1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that

the public interest would be furthered by the injunction."  *Gomez v. Kelly*, 237 F. Supp. 3d 13, 14 (D.D.C. 2017).

Following the Supreme Court's decision in *Winter v. NRDC, Inc.*, 555 U.S. 7 (2008), many district courts have held that where "plaintiffs have failed to show any irreparable harm, they are not entitled to a preliminary injunction, and in the interest of judicial efficiency the Court need not address the other three factors."  *Guttenberg v. Emery*, 26 F. Supp. 3d 88, 101 (D.D.C. 2014); *see also Gomez*, 237 F. Supp. 3d at 15-16 (D.D.C. 2017) ("[B]oth the United States Supreme Court and the Court of Appeals for the D.C. Circuit have emphasized that a movant must show at least some likelihood of irreparable harm in the absence of an injunction."); *Baker DC v. Nat'l Labor Relations Bd.*, 102 F. Supp. 3d 194, 198-99 (D.D.C. 2015) ("A movant's failure to make a showing of irreparable injury is grounds for refusing to grant emergency relief, even if the other factors are met."); *Spadone v. McHugh*, 842 F. Supp. 2d 295, 301 (D.D.C. 2012) ("A showing or irreparable injury traditionally is a threshold requirement for a preliminary injunction." (internal quotations omitted)).

As for a "likelihood of success on the merits", Plaintiffs here face a heightened standard on two different fronts.  First, as this Court has previously held when the same Plaintiffs' counsel unsuccessfully brought another lawsuit under the same Wrap Around Plan several years ago, "Plaintiffs, in a civil contempt action, must show by 'clear and convincing evidence' that a court order has been violated and the provisions of that order are themselves 'clear and unambiguous.'"  *Morales v. Intelsat Global Service Corp.*, Case No. 1:04-cv-1044-GK, Mem. Order (Dkt. 107) (D.D.C. Aug. 22, 2012), at 1 (quoting *United States v. Microsoft Corp.*, 147 F.3d 935, 940 (D.C. Cir. 1998)).

Second, the Wrap Around Plan grants Intelsat "sole discretion to carry out its responsibilities to construe and interpret the provisions of the Plan," and Intelsat's conduct will be reviewed only for abuse of that discretion.  (*See, e.g.*, Altman Decl. Ex. 1 § 8.4(A); *see also id.* §§ 8.3, 8.4(B).)  Accordingly, Plaintiffs must show ***not only*** that the terms of the underlying consent judgment were violated, and ***not only*** that they have a likelihood of proving that violation by "clear and convincing evidence," but also that they are likely to overcome the presumption in Intelsat's favor regarding interpretation.  (*Id.* §§ 8.4(A), (B); *see also Morales*, Mem. Order at 5-6 (citing arbitrary and capricious standard as applying to plaintiffs' civil contempt motion).)

Finally, a motion for preliminary injunction will be rejected where the movant fails to offer "credible" and "competent" evidence in support of its claims, such as affidavit or exhibits. *See Miniter*, 684 F. Supp. 2d at 16 (denying motion for preliminary injunction where plaintiff offered no evidence to substantiate his claims); *Barton v. Venneri*, No. 05-cv-0669(JDB), 2005 WL 1119797, at *3 (D.D.C. May 11, 2005) (denying motion for preliminary injunction where "plaintiff has not submitted any competent evidence into the record (i.e., affidavits, exhibits) that would permit the Court to assess whether she, in fact, faces irreparable harm[.]").

Here, Plaintiffs' Motion is based entirely on the statements of counsel, particularly with respect to its bald claims of irreparable harm; not a single affidavit or even a verified complaint has been filed.

## <u>ARGUMENT</u>

### I.    THE PLAINTIFFS FACE NO RISK OF HARM, AND CERTAINLY NO RISK OF IRREPARABLE HARM

"The D.C. Circuit 'has set a high standard for irreparable injury' to warrant preliminary injunctions." *Hispanic Affairs Project v. Perez*, 141 F. Supp. 3d 60, 68 (D.D.C. 2015) (quoting

*Mexichem Specialty Resins, Inc. v. Envtl. Prot. Agency*, 787 F.3d 544, 555 (D.C. Cir. 2015)).

"To make the required showing . . . a moving party must establish that its injury satisfies a two-

part test." *Sterling Commercial Credit-Michigan, LLC v. Phoenix Indus. I, LLC*, 762 F. Supp. 2d

8, 14 (D.D.C. 2011).

"First, the injury must be both certain and great; it must be actual and not theoretical" and

it must be "of such imminence that there is a clear and present need for equitable relief to prevent

irreparable harm." *Id.* (internal citations and quotations omitted).

"[I]t is not enough for a plaintiff to show that it will suffer *some* harm . . . instead, the

moving party must demonstrate that its harm will be 'great.'" *N. Air Cargo v. U.S. Postal Serv.*,

756 F. Supp. 2d 116, 125 (D.D.C. 2010) (emphasis added) (quoting *Wis. Gas Co. v. Fed. Energy*

*Regulatory Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985)). "Put another way, 'the injury must be

more than simply irretrievable; it must also be serious in terms of its effect on the plaintiff." *Id.*

(quoting *Gulf Oil Corp. v. Dep't of Energy*, 514 F. Supp. 1019, 1026 (D.D.C. 1981)).

Moreover, "[b]are allegations of what is likely to occur are of no value since the court

must decide whether the harm will *in fact* occur." *Sterling Commercial*, 762 F. Supp. 2d at 14

(emphasis in original) (quoting *Wis. Gas Co.*, 758 F.2d at 674 (emphasis in original)); *see also*

*Baker DC*, 102 F. Supp. 3d at 203 ("[A] speculative injury cannot form the basis for granting

emergency injunctive relief.").

"Second, the injury must be beyond remediation." *Sterling Commercial*, 762 F. Supp. 2d

at 15. "[I]t is well-settled that 'recoverable economic losses are not considered irreparable.'"

*Brown v. D.C.*, 888 F. Supp. 2d 28, 32 (D.D.C. 2012) (quoting *Taylor v. Resolution Tr. Corp.*, 56

F.3d 1497, 1507 (D.C. Cir. 1995)); *see also Guttenberg*, 26 F. Supp. at 102 ("The possibility that

adequate compensatory or other corrective relief will be available at a later date, in the ordinary

course of litigation weighs heavily against a claim of irreparable harm." (quoting *Wis. Gas Co.*, 758 F.2d at 674.

Courts in this Circuit have routinely rejected claims that loss of health insurance coverage constitutes irreparable harm absent proof that the petitioner actually will be denied "critical" medical care.  That a plaintiff will suffer more "costly" coverage is not sufficient.  *See, e.g.*, *Penland v. Mabus*, 643 F. Supp. 2d 14, 21-22 (D.D.C. 2009) (denying motion for preliminary injunction despite allegation that plaintiff did not "have the financial resources to purchase health insurance" where plaintiff would continue to receive care from Veterans Affairs); *Carabillo v. ULLICO Inc. Pension Plan & Tr.*, 355 F Supp. 2d 49, 54-55 (D.D.C. 2004) (denying motion for preliminary injunction where there was no "imminent threat to the plaintiff's health" and "his argument regarding the loss of health benefits appear[ed] to focus on his allegation that . . . [coverage] will be at 'costly' rates").

Finally, as Plaintiffs' cited case law concludes, where "the Court finds that plaintiffs have failed to show any irreparable harm, [plaintiffs] are not entitled to a preliminary injunction, and in the interest of judicial efficiency the Court need not address the other three factors." *Guttenberg*, 26 F. Supp. 3d at 101.

Here, Plaintiffs have not shown a likelihood of *any* harm, let alone met their burden of demonstrating a likelihood of *irreparable* harm by the requisite "clear showing."  And even if Plaintiffs' contentions of harm were taken at face value, it is abundantly clear that Plaintiffs' focus is on alleged ***monetary damage***.

*First*, between now and the end of the year, there is absolutely no risk of harm to retirees, because ***everything about their medical coverage remains exactly the same*** until the Proposed Change would go into effect on January 1, 2019. (Altman Decl. ¶ 4.)  Accordingly, right off the

bat, Plaintiffs fail to show injury "of *such imminence* that there is a clear *and present* need for

equitable relief[.]"  *Sterling Commercial*, 762 F. Supp. 2d at 14 (emphasis added).  Indeed, as

discussed above (*supra* at 3), Intelsat has already selected the Neutral Expert that Plaintiffs

nominated, and the Neutral has agreed to complete his analysis and render his decision by the

end of November – well in advance of the 2019 implementation date (*i.e.*, if Plaintiffs' counsel

does not continue to impede and delay the process).  That decision either will moot the instant

motion – if the Neutral finds against Intelsat – or, if he finds in Intelsat's favor, then per Section

7.5 of the Wrap Around Plan, the Proposed Change is permitted to "be implemented by Intelsat"

without more.  The parties already agreed that the only pre-condition on the implementation of

the Proposed Change is a favorable ruling by the Neutral.  Any other grievances, therefore, can

and must be determined in the ordinary course of a normal proceeding by individual retirees

seeking damages.

  *Second*, even after the Proposed Change goes into effect on January 1, Plaintiffs'

assertion that they "face the prospect of losing their health insurance" is nothing but alarmist

rhetoric and unsupported speculation.  (*See* Pls. Mot. at 11.)  Plaintiffs' counsel baldly and

speculatively contends that "many [retirees] are receiving medical care for chronic conditions

that *could be* interrupted or discontinued entirely[.]"  (Pl. Mem. at 6) (emphasis added).  Not

only is the first half of this statement unsupported by a single affidavit or other piece of evidence,

but, even if it were, the suggestion of interrupted care is entirely and impermissibly speculative.

*See, e.g.*, *Guttenburg*, 26 F. Supp. 3d at 102 ("[B]are allegations of what is likely to occur are of

no value." (quoting *Wis. Gas Co.*, 758 F.2d at 674)); *Baker DC*, 102 F. Supp. 3d at 203 ("[A]

speculative injury cannot form the basis for granting emergency injunctive relief.").  There is

absolutely no reason to believe anyone's care would be "interrupted or discontinued," as any and

all pre-existing conditions will indeed be covered by every individual plan in the marketplace (and without increased cost).  (Altman Decl. ¶ 8.)  Equally *speculative and unsupported* are statements that some undisclosed number of retirees (but relatively few) will have to choose between receiving medical care and foreign travel.  (Pls. Mot. at 11; Altman Decl. ¶ 37.)  Plan F *covers* emergency health care while abroad, as do many other Medigap plans.  While it is true that there is a lifetime cap of $50,000, that is likewise true for the majority of Americans who have Plan F and other Medigap plans, and yet they *still* travel abroad despite that cap.  Moreover, there is nothing in the record to suggest that any retiree actually and imminently will be faced with this decision, or that any retiree will not travel abroad because of the *possibility* that he or she may need emergency medical care beyond $50,000.  In any event, they could purchase travel insurance to cover that risk if they are so concerned, and if they win herein, they can force Intelsat to reimburse them for it (and it also is reimbursable from retirees' HRA accounts).

*Third*, and in contrast to Plaintiffs' counsel's *ipse dixit*, Intelsat has submitted the declarations of both Wes Altman, Intelsat's Benefits Manager, and Sudhakar Natarajan, a senior Willis Towers Watson actuary with nearly twenty years of experience.  Those uncontradicted declarations demonstrate not only that the Objecting Retirees **will retain** healthcare coverage, but also that they will receive comparable, if not better, coverage.  Specifically, Messrs. Altman and Natarajan attest that:  (1) objecting retirees' primary insurer now (save for maybe three retirees) is Medicare, and will remain, Medicare; (2) Medicare covers, and will continue to cover, approximately 80% of retirees' medical expenses; (3) the current Intelsat Plan acts only as supplemental insurance, paying *up to* the remaining 20%; and (4) the current Intelsat Plan will be replaced with an HRA amount sufficient to permit retirees to purchase a Medigap Plan F – the most comprehensive Medigap plan on the market, which is comparable to, and in many ways

better than, the current Plan insofar as it has lower costs and broader coverage of medical providers.  (Altman Decl. ¶¶ 8, 33; Natarajan Decl. ¶¶ 17-20, 25-27.)

*Fourth*, Plaintiffs' more "concrete" examples of alleged harm, make abundantly clear that Plaintiffs' ***true focus is on money*** – *i.e.*, the allegedly higher premium and prescription drug costs retirees allegedly will incur.  (Pls. Mot. at 7-8.)  Plaintiffs contend, for example, that "Retiree Jack is currently paying $869.00 per year for his prescriptions, and under the Via Benefits Medicare Plan D plan, his cost would increase to $3,324.00" and for "retiree Frederic . . . the new plans would cost him and his wife over $4,587.00 beyond what they are paying now[.]" (*Id.* at 8-9.)  Retirees "Dave" and "Timothy" allegedly face the greatest increased costs of $7,494 and $6,815 for the year, respectively.  (*Id.*)

Even if these examples were accurate – which Intelsat refutes below (*see infra* Section III) and in the Declaration of Sudhakar Natarajan – such alleged harms constitute quintessential "recoverable economic losses [that] are not considered irreparable." *Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1291, 1294-95 (D.C. Cir. 2009) (quoting *Taylor*, 56 F.3d at 1507) (denying retired airline pilots' motion to preliminarily enjoin recoupment of, on average, approximately ***$7,000*** in pension benefits, for failure to establish irreparable harm).

Indeed, these relatively minor alleged costs – at most a few hundred dollars per month – do not meet the required standard of "great harm" – *i.e.* harm that is "more than simply irretrievable" but, rather "serious in terms of its effect on the plaintiff." *N. Air Cargo*, 756 F. Supp. 2d at 125.  Certainly, such costs are compensable by Intelsat, if necessary, "in the ordinary course of litigation[.]" *Guttenberg*, 26 F. Supp. at 102; *see also Cornish v. Dudas*, 540 F. Supp. 2d 61, 64 (D.D.C. 2008) ("[M]ere injuries, however substantial, in terms of money . . . are not enough."), *aff'd sub nom. Cornish v. Doll*, 330 F. App'x 919 (Fed. Cir. 2009).

19

A similar allegation of irreparable harm was addressed, and rejected, in *Carabillo v. ULLICO Inc. Pension Plan & Trust*, 355 F. Supp. 2d 49 (D.D.C. 2004).  There, the plaintiff sought a preliminary injunction requiring his benefits plan administrator to enroll him in healthcare insurance during the pendency of an underlying action in which he alleged wrongful denial of benefits.  *Id.* at 51-52.  The plaintiff alleged irreparable harm would occur absent an injunction because he was forced to pay over $900 *per month* for COBRA health insurance coverage which, in any event, was set to expire.  *Id.* at 52-53.  The court rejected the plaintiff's arguments, finding that "[n]either an imminent threat to his health or well-being, nor a significant non-compensable harm" was alleged and, instead, the plaintiff's "argument regarding the loss of health benefits appear[ed] to focus on his allegation that . . . [coverage] will be at 'costly' rates." *Id.* at 54.

As in *Carabillo*, the only (meagerly) supported allegations of harm in Plaintiffs' moving papers are for alleged increased costs of medial and prescription drug coverage.  But even accepting Plaintiffs' incorrect calculation of costs, there is no evidence to support Plaintiffs' suggestion that the retirees are indigent or cannot cover these relatively minor costs until this matter is fully resolved (perhaps as soon as first quarter 2019).  To the contrary, the *only* evidence submitted regarding Plaintiffs' financial situation is that they generally have "rich pension" benefits provided by Intelsat.  (Altman Decl. ¶ 12.)

*Fifth* and finally, a plaintiff's delay in seeking a preliminary injunction "undermines [their] showing of irreparable injury."  *Heart 6 Ranch, LLC v. Zinke*, 285 F. Supp. 3d 135, 144 (D.D.C. 2018) (quoting *Biovail Corp. v. U.S. Food & Drug Admin.*, 448 F. Supp. 2d 154, 165 (D.D.C. 2006); *see also Jack's Canoes & Kayaks, LLC v. Nat'l Park Serv.*, 933 F. Supp. 2d 58, 81 (D.D.C. 2013) (finding plaintiff had failed to make the requisite showing of irreparable harm

where, *inter alia*, plaintiff waited "an entire month" after receiving notice of the National Park Service's action terminating plaintiff's lease); *Guttenberg*, 26 F. Supp. 3d at 103 (plaintiff's approximate two-month delay in filing for a preliminary injunction "weighs against a finding of irreparable harm").  Here, Plaintiffs were notified of the Propose Change on September 3, 2018 and their counsel confirmed receipt of the notification just two days later, on September 5. (Altman Decl. ¶¶ 19, 22.)  By September 27, more than 30 of Mr. Postol's clients had expressed an objection to the change.  (*Id.* ¶ 24.)  Yet, Plaintiffs did not file for a preliminary injunction until October 17.  Plaintiffs' *six week delay* in filing for this "extraordinary" relief – in addition to all of the reasons explained above – makes a finding of irreparable harm improper.

## II.   THERE IS A REAL RISK OF IRREPARABLE HARM TO THE NON-OBJECTING RETIREES, AND TO INTELSAT

"In considering any request for preliminary injunctive relief, the Court must weigh the potential harm injunctive relief may inflict upon other interested parties."  *Katz v. Georgetown Univ.*, No. 00-cv-2412, 2000 WL 33539394, at *6 (D.D.C. Nov. 6, 2000), *aff'd*, 246 F.3d 685 (D.C. Cir. 2001); *see also Nat'l Assoc. for Fixed Annuities v. Perez*, 219 F. Supp. 3d 10, 13 (D.D.C. 2016) (where a movant makes a weak showing of a likelihood of success on the merits, "it bears the heavy burden of demonstrating that little if any harm will befall other interested persons or the public" (internal quotations omitted)).  This factor is of particular importance where, as here, the parties "which would potentially bear the greatest burden of a preliminary injunction, [are] not named as [] party-defendant[s]."  *Katz*, 2000 WL 33539394, at *7.

Plaintiffs' Memorandum of Points and Authorities baldly asserts that "[t]he only other parties that may be affected by the granting of the requested injunction are the Defendants." (Pls. Mem. at 7.)  But this statement *intentionally ignores the majority of retirees* – approximately 266 out of 434 (over 60%) – who have *not objected* to the Proposed Change and

who will lose out on substantial savings if the Proposed Change is enjoined.  Indeed, Intelsat has

modeled an average and median annual savings across all retirees of approximately $1,150 under

the Proposed Change – that is, over $300,000 in lost value to just the non-objectors.  (Natarajan

Decl. ¶ 21.)  The objecting minority has no way to make the non-objecting majority whole for

these lost savings, leaving the risk of the requested injunction to be borne entirely by the non-

party retirees.  A preliminary injunction is improper on this basis alone.  *See Katz*, 2000 WL

33539394, at *7 (denying preliminary injunction where non-party bore the risk of greatest

burden).

Moreover, Plaintiffs casually discount the harm to Intelsat as "marginal."  (Pls. Mot. at

11.)  But the millions of dollars that Intelsat will save from a balance sheet liability and cash

flow is hardly "marginal" (Altman Decl. ¶ 14) and, in any event, will likewise go uncompensated

by the Plaintiffs should they lose.

## III.   PLAINTIFFS CANNOT SHOW A LIKELIHOOD OF SUCCESS ON THE MERITS UNDER EITHER THE NORMAL PRELIMINARY INJUNCTION STANDARD OR THE HIGHER STANDARD APPLICABLE HERE

The Court need not even address the likelihood of success because Plaintiffs' Motion has

failed the first prong:  irreparable harm.  In any event, Plaintiffs' Motion fails on this ground as

well.  "[A] plaintiff must make, at the least, a strong showing of a likelihood of success on the

merits . . . or he cannot obtain preliminary injunctive relief."  *Seeger v. United States Dep't of*

*Def.*, 306 F. Supp. 3d 265, 288, 290-91 (D.D.C. 2018) (denying motion for preliminary

injunction where Department of Defense had exercised its discretion rationally).

But here, a likelihood of success on the merits means not only a "strong showing" that

the Consent Decree and incorporated Wrap Around Plan were violated, but a showing that

Plaintiffs can meet the "heavy burden" of proving civil contempt by "clear and convincing

evidence" (*Microsoft*, 147 F.3d at 940), and also overcome the contractual grant to Intelsat of sole discretion to interpret the Plan.  (Altman Decl. Ex. 1 §§ 8.4(A), (B).)

Plaintiffs' Motion raises a litany of alleged Plan violations, in an apparent strategy of throwing everything against the wall in the hope that something sticks.  As demonstrated below, none of Plaintiffs' theories "stick," and Plaintiffs cannot show a likelihood of success on the merits – no matter what standard is applied.

A.      **The Permissibility of the Proposed Change Must be Judged by a Neutral Expert But, In Any Event, Plaintiffs Have Not Made a Sufficient Showing that the Proposed Change Will Be Disallowed**

There is no dispute that the permissibility of a Proposed Change is to be judged by the terms of Section 7 of the Wrap Around Plan – *i.e.*, "whether or not [the] Proposed Change reduces the value of the Medical Benefits, taken as a whole[.]"  (Altman Decl. Ex. 1 § 7.4; *see also id.* at 2, 7; §§ 4.3, 5.1(C), 7.5, 8.6; Pls. Mot. at 4.)  Nor is there any dispute that the parties contracted to have that decision made by a neutral expert.  (*See, e.g.*, Pls. Mot. at 4 ("If thirty (30) retirees object . . . then a neutral expert *must* determine if the requirement that the overall benefits not be reduced was met" (emphasis added).)  Indeed, placing this decision in the hands of a neutral expert is necessary because Section 7 requires a valuation of the medical benefits using "accepted actuarial principles and procedures" (*e.g.* Altman Decl. Ex. 1 § 7.5) – a task not typically within the wheelhouse of even the most knowledgeable district court judges.

Nonetheless, the majority of issues Plaintiffs raise with the Court as alleged violations of the Wrap Around Plan are Section 7 issues that will be decided by that Neutral.  For example, Plaintiffs' recitation of "minimum requirements" (Pls. Mot. at 5), are simply a subset of the factors that the Neutral is to consider before approving the Proposed Change.  (Altman Decl. Ex. 1 § 7.5.)  It is precisely the Neutral's job to evaluate the Proposed Change in light of these factors.

23

It is worth noting, however, that with respect to alleged violation of these "minimum requirements," Plaintiffs have not made the required showing of likelihood of success on the merits.  Plaintiffs cite a provision requiring that "[t]he program of 'in-network' medical providers, designated pharmacies or lists of prescription drugs covered under the Component Benefits Programs should be reasonably comparable to [those] in place as of the Effective Date." (Pls. Mot. at 5 (citing Altman Decl. Ex. 1 § 7.5(Part A).)  But, Plaintiffs have made no showing that this "comparability" standard is not met.  They cannot because all Medigap plans allow for any provider that accepts Medicare – and that is approximately 95% of providers nationwide.  Indeed, Medigap Plan F goes even further – it reaches about 98% of providers nationwide. (Natarajan Decl. ¶ 26.)  A network that reaches *virtually every* provider in the country cannot be inferior to the current network.  It is not surprising, therefore, that the parties' Neutral Expert (Roger Burton) – the very one Plaintiffs nominated – has already advised the Parties that "Medicare providers are . . . very widespread, and *we will conclude that the new network of Medicare providers is comparable*."  (Declaration of J. Calandra ("Calandra Decl.") Ex. M, at 1 (emphasis added); *see also* Natarajan Decl. ¶¶ 26-29 (declarations affirming that the new coverage will be comparable and the access to medical providers will be *greater*).)

Plaintiffs likewise contend that the Section 7 provisions limiting increases to deductibles, out-of-pocket costs, and prescription drug co-insurance payments have not been met.  (Pls. Mot. at 5 (citing Altman Decl. Ex. 1 § 7.5(Part B(ii)-(iv)).)  Putting aside the fact that this is, again, a question for the Neutral, Plaintiffs simply have gotten the math wrong.  As explained in Intelsat's accompanying declarations, Intelsat designed the Proposed Change, and specifically the HRA amount, to permit retirees to purchase Medigap Plan F.  Plan F requires *no* out-of-

pocket costs, *no* co-pays, *no* co-insurance, and *no* deductibles.  (Natarajan Decl. ¶ 26; Altman

Decl. ¶ 33.)  It clearly offers retirees a better, not reduced, set of benefits as a whole.

And, as for prescription drug co-insurance payments, it is somewhat unclear whether

Plaintiffs consider this an alleged violation of Section 7 (*see* Pls. Mot. at 5), or of Section 5.  (*See*

*id.* at 7.)  Regardless, Intelsat has set up three "special" payments (in addition to their HRA) to

ensure that retirees pay no more for prescription drugs than they currently do.  (Natarajan Decl.

¶¶ 32-34.)  As explained in detail in the Declaration of Sudhakar Natarajan, the five exemplar

retirees described in Plaintiffs' motion who contend they will pay more for prescription drugs

than they currently do, have failed to take into account these additional special payments.  (*Id.*

¶¶ 35-40; *see also* Altman Decl. Ex. 3 at 4 (describing and providing examples of the special

payments).)

Next, Plaintiffs contend that Section 7 prohibits Intelsat from "eliminat[ing] important

and necessary benefits or service."  (Pls. Mot. at 4.)  Plaintiffs cannot meet their burden on this

argument either.  The alleged prohibition is not a prohibition at all, but rather a guidepost for the

Neutral Expert to consider within his broader Section 7 "as a whole" valuation analysis.  (*See*

Altman Decl. Ex. 1 § 7.5(Part A).)  Moreover, it would be non-sensical to read the provision to

mean Intelsat cannot make changes if *any individual* retiree – as opposed to the group "as a

whole" – loses a benefit that he/she considers personally "important."  If that were true, no

change would be allowed, as all changes impact individuals differently.  (Altman Decl. ¶ 26;

Natarajan Decl. ¶¶ 22, 30.) This is precisely why the standard for evaluation of the Proposed

Change's impact is to be measured on the group "*as a whole*."  Put differently, the "importance"

of benefits must be viewed "as a whole," not individually, and it is determined by the Neutral

Expert in performing his actuarial analysis under Section 7.  And, again, Plaintiffs provide no

evidence or support for their contention.  The only example of an allegedly "important" benefit missing from the Proposed Change is medical coverage during international travel.  (Pls. Mot. at 10.)  But a lawyers' statement of alleged "importance" does not suffice.  Not a single Plaintiff has attested that this benefit is "important and necessary," and Intelsat's evidence (actual utilization data) demonstrates, to the contrary, that it is a benefit *rarely* used by the retirees. (Altman Decl. ¶ 37 & Ex. 11 (only 15 of approximately 460 retirees (3%) have made use of *any* foreign medical coverage and none have come close to meeting the limit).)

Finally, Plaintiffs contend that Intelsat is required to use "commercially reasonable efforts to contract with the same insurance carriers and Claims Administrator for this Plan as for the program of medical benefits that are offered to active employees of Intelsat. . . ."  (Pls. Mot. at 3-4) (alteration in Pls. Mot.).  But, Plaintiffs omit the crucial finale to that sentence – *i.e.*, that such efforts should be made "*to the extent that* the structure and design of such medical benefits for active employees are *substantially similar* to the Medical Benefits provided to [the retirees]." (Altman Decl. Ex. 1 § 7.2) (emphasis added).  Intelsat's active employees will *not* receive health insurance under a similar "structure and design" (Altman Decl. ¶ 30 n.3), so this provision does not even apply.

In short, the Neutral Expert has a job to do and should be permitted to do it.  Intelsat has no doubt that the Neutral will find that "the Proposed Change does not reduce the value of the Medical Benefits, taken as a whole, below the value of the Medical Benefits, taken as a whole, as of the Effective Date [November 2007]."  (Altman Decl. Ex. 1 § 7.5.)  Regardless, it is equally certain that Plaintiffs have made no showing to the contrary, let alone a showing by "clear and convincing" evidence.  *See, e.g.*, *Davis v. Billington*, 76 F. Supp. 3d 59, 64 (D.D.C. 2014)

(denying preliminary injunction where, *inter alia*, there were many outstanding factual disputes yet to be resolved, giving plaintiff "at best . . . an equal chance of succeeding" on the merits).

**B.** **Plaintiffs' Remaining Claims Alleging Hyper-Technical Violations Also Do Not Withstand Scrutiny**

Plaintiffs contend that the Neutral Expert cannot resolve all of the alleged violations of the Plan and point to the following four alleged issues: [2]  (1) retirees cannot be required to pay higher premiums than are set out in Section 5 of the Plan (Pls. Mot. at 3); (2) retirees cannot be required to purchase Medicare Part D (prescription drug coverage) or pay more out-of-pocket than they currently do (*id.* at 6-7); (3) the Plan must remain covered by ERISA and Intelsat must remain a plan fiduciary (*id.* at 9), and (4) the Notice provided to retirees of the Proposed Change was technically deficient (*id.* at 10).

Plaintiffs cannot demonstrate that the Proposed Change violates any of these Plan provisions, let alone do so by "clear and convincing" evidence, giving proper deference to Intelsat's interpretation of the Plan.  Regardless, and as noted above (*supra* at 3), the Court need not address any of these issues before the Neutral rules on the permissibility of the Proposed Change under Section 7.  Moreover, if Plaintiffs can establish violations of the Wrap Around Plan, they will have a right to recover damages (if any exist).

*First*, Plaintiffs cite to Section 5.2 for the proposition that their annual premiums cannot be increased more than the Consumer Price Index.  To be more precise, Section 5.2 limits how much retirees can be required to contribute for "their share" of premiums.  (Altman Decl. Ex. 1 § 5.2(A) ("The cost of the Medical Benefits provided through the Component Benefit Programs will be funded in part by Company contributions and in part by contributions from Covered

---

[2] Notably, while taking this position in their Motion for Preliminary Injunction, Plaintiffs' Motion for Directive to Neutral Expert *inconsistently suggests* that the *Neutral* must resolve these issues, and asks the Court to instruct the Neutral on how to do so.

Persons. . . ."); *id.* § 5.2(D) ("The Company will determine and periodically communicate to

each Eligible Retiree . . . *their share* of the cost of the Medical Benefits. . . .") (emphasis added).)

The Proposed Change ***makes no increase*** to the retirees' annual contributions of $615.  (Altman

Decl. ¶¶ 27, 31.)  As noted above, Intelsat subsidizes premiums, and will continue to do so.  (*Id.*

¶ 27.)  While it is true that premiums of the newly available plans are nominally higher, Intelsat

is *paying that difference* through the HRA amount provided to each covered retiree.  (*Id.*)

   *Second*, Plaintiffs point to Section 5.1(D)(7) as prohibiting Intelsat from requiring retirees

to purchase Medicare Part D (prescription drug coverage).  (Pls. Mot. at 6; Pls. Supp. Br. at 1.)

However, a rational reading of this provision and, indeed, Intelsat's interpretation, is that the

provision prohibits Intelsat from requiring retirees to purchase Medicare Part D ***at their own***

***expense***.  (Altman Decl. ¶ 28.)  Intelsat's interpretation is entitled to deference and clearly is

rational, not "arbitrary and capricious." (Altman Decl. Ex. 1 §§ 8.4(A), (B); *see also Morales*,

Case No. 1:04-cv-1044-GK, Mem. Order, at 5-6.)  Retirees are ***not*** being required to purchase

Part D at their own expense.  Rather, they are being provided an HRA *sufficient to pay Medicare*

*Part D premiums*, not to mention three special reimbursement payments to cover any additional

drug out-of-pocket costs.  (Altman Decl. ¶ 34; Natarajan Decl. ¶¶ 32-34.)

   *Third*, Plaintiffs contend that the newly available plans will not be covered by ERISA and

Intelsat will not be a fiduciary.  To the contrary, the HRA is a self-insured health plan that *is*

covered by ERISA.  *See, e.g.*, IRS Notice 2002-45, at 13.  Therefore, any retiree claims

regarding eligibility (unlikely to exist since this is a closed class), the HRA amount, and/or their

HRA reimbursement will continue to be covered by the ERISA claims and appeals procedures.

Intelsat has delegated its fiduciary duty as Claims Administrator to Via Benefits, as it is

permitted to do under Sections 8.1 and 8.5 of the Wrap Around Plan.  Moreover, Medical

coverage appeals will be addressed by the insurance carrier, just as they would be if Intelsat were "fully insured" under the Wrap Around Plan.  (*See* Altman Decl. Ex. 1 §§ 8.3(A), 8.5(C).)  While it is true that the carrier will not be a fiduciary of the retiree, the carrier will now have direct privity with the retiree (as opposed to today), and the retiree can sue the carrier directly for any breach of contractual obligations owed directly to the retiree.  The process relating to the denial or approval of claims, and any appeals thereof, will be substantially the same as they would be under the Wrap Around Plan as if Intelsat were "fully insured" – *i.e.*, Intelsat will still have no role or discretion with respect to them.  (*Id.* § 8.5(C) ("With respect to a Medical Benefit provided under a Component Benefit Program that is fully-insured . . . [Intelsat] shall have no discretionary authority except to the extent described in Section 8.3.").)  In short, nothing in the Wrap Around Plan prohibits Intelsat from making this change, and Plaintiffs have offered no competent evidence showing how this would harm them in any way.

*Finally*, Plaintiffs contend that the Notice of the Proposed Change provided to retirees on September 3, 2018 was technically deficient.  To the contrary, and as explained in the Declaration of Wes Altman, the 10-page notice described the Proposed Change in detail, provided examples, and included an appendix showing the impact of the change on low, average and high benefit utilizers (based on "an actuarial analysis").  (Altman Decl. ¶¶ 19-21.)  The Notice also included charts comparing the existing Plan and the Proposed Change with respect to lifetime maximums, deductibles, out of pocket maximums, and prescription costs.  (*Id.* ¶ 20.)

Putting aside the fact that Plaintiffs have cited *no harm* stemming from the allegedly deficient Notice, Intelsat was, at the very least, in "substantial compliance" with the Plan's notice provisions.  *See, e.g.*, *Howard Town Ctr. Developer, LLC v. Howard Univ.*, 278 F. Supp. 3d 333, 401 (D.D.C. 2017) (rejecting "overly formalistic" application of notice requirement where

defendant was in "substantial compliance").  Here, the Notice obviously *served its purpose – i.e.*, it provided retirees with the information necessary to decide to object to the Propose Change (Altman Decl. ¶ 23), and they were able to object based on the information provided.  Issuance of any more elaborate notice by Intelsat at this point would serve no purpose.

In sum, despite bombarding the Court with a litany of alleged Plan violations, Plaintiffs fail to support those allegations with evidence and, as demonstrated above, Plaintiffs' allegations are easily refuted.  Plaintiffs have not even come close to making a strong showing of likelihood of success on the merits.

## IV.    PLAINTIFFS ENTIRELY FAIL TO ADDRESS THE PUBLIC INTEREST

Finally, courts will consider whether "the public interest would be furthered by the injunction."  *Gomez*, 237 F. Supp. 3d at 14.  On this factor, Plaintiffs offer nothing more than the conclusory statement that "injunctive relief will not adversely affect the public[.]"  (Pls. Mem. of Law at 7; Pls. Mot. at 11.)  But Plaintiffs must carry the burden of persuasion by "a clear showing" (*Miniter*, 684 F. Supp. at 15), and conclusory statements will not suffice.  *Cornish*, 540 F. Supp. 2d at 65 (denying motion for preliminary injunction where plaintiff provided "only broad conclusory statements").

Contrary to Plaintiffs' assertion, the public interest will be furthered by enforcing the parties' contractual agreement to have the validity of the Proposed Change determined by a Neutral Expert.  *See, e.g.*, *Book v. Robert Half Int'l, Inc.*, 413 F.3d 77, 80 (D.C. Cir. 2005) (affirming lower court's decision to enforce arbitration clause in light of "federal policy favoring enforcement of agreements to arbitrate"); *Gov't of Jamaica v. 1201 29th St., N.W. Tenants Ass'n, Inc.*, No. 92-cv-0836(JHG), 1992 WL 84908, at *4 (D.D.C. Apr. 7, 1992) (denying temporary

restraining order and stating that "the public interest favors . . . the enforcement of binding contracts").

**V.  THE COURT SHOULD REJECT PLAINTIFFS' COUNSEL'S OBVIOUS EFFORTS TO POISON, OBSTRUCT, AND DELAY THE NEUTRAL EXPERT'S REVIEW**

Plaintiffs' Motion for Directive to the Neutral is just the latest step in Plaintiffs' counsel's ill-disguised campaign to poison, obstruct and delay the required neutral expert assessment of Intelsat's Proposed Change.  As laid out below, that campaign shifted into full gear once it became apparent that either of the parties' proposed neutrals could complete the required analysis well in advance of the Proposed Change's 2019 implementation date, thereby undermining one of Plaintiffs' main grounds for requesting emergency relief.  Moreover, although carefully couched as an effort to give the Neutral Expert "more precise instructions," it is clear from the content of the Motion for Directive – as well as the timeline of events recited in the accompanying Calandra Declaration – that this latest Motion is simply a new tactic employed to influence and delay the Neutral's ultimate decision.

Plaintiffs' Motion, for instance, improperly asks this Court to "instruct" the Neutral Expert on how to create a sample population for his actuarial analysis, and that "he must look at the actual utilization of the Plaintiff retirees."  (Pls. DNE Mot. at 2.)  The Neutral Expert is an actuary and an expert in health benefits.  He is more than capable of reading the words on the pages of Section 7 for himself and applying actuarial principles to determine the sample population.  Plaintiffs' counsel also wants the Court to instruct the Neutral Expert to value current travel insurance benefits in his "as a whole" analysis (*id.* at 3), despite the fact that in the Motion for a Preliminary Injunction, counsel argues inconsistently that the Neutral Expert "cannot" decide this issue.  (Pls. Mot. at 10.)  And Plaintiffs want the Court to dictate to the Neutral Expert what information he *must* review and what information Intelsat *must* provide him

31

(Pls. DNE Mot. at 4), knowing full well that Intelsat already has committed to "provide [the Neutral] with whatever information [the Neutral] deem[s] necessary," and certainly the information the two other actuaries asked for:  WTW and Mercer.  (Calandra Decl. ¶ 22.)  More recently, Plaintiffs' counsel has demanded the power to veto any materials Intelsat wants to provide to the Neutral.  (After Defendants' refused this ridiculous request, Plaintiffs' counsel wrote back that his "agreement" to have the Neutral *he* himself nominated is withdrawn and now "void.")  (*Id.* ¶ 41 & Ex. K.)

If the Neutral has questions for the parties, he certainly can pose them (and *has* posed them) to the parties, and the parties certainly will present their respective positions to him. Otherwise, the Neutral simply should be left to do his job.

A bit of background here will assist the Court in understanding why Plaintiffs' counsel's latest tactical Motion should be rebuffed in its entirety:

The Wrap Around Plan provides that "the matter of whether or not the Proposed Change reduces the value of the Medical Benefits, taken as a whole ***shall be referred*** for decision to the Neutral Expert[.]"  (Calandra Decl. ¶ 7; Altman Decl. Ex. 1 § 7.3(E)) (emphasis added).  The parties agreed – ten years ago – to the scope of the neutral's engagement:  "The sole task of the Neutral Expert is to determine whether or not a Proposed Change reduces the value of the Medical Benefits, taken as a whole, ***using the standards and methodologies set forth in this Section 7***."  (Altman Decl. Ex. 1 § 7.4) (emphasis added).

Although Section 7 sets forth specific instructions, requirements, and guidelines for how his analysis should be performed, it also repeatedly instructs the Neutral (***seven times***) to utilize "actuarial" standards and requires the Neutral to utilize "his/her own expertise" and to rely on "generally accepted actuarial and valuation principles for valuing medical benefit programs."

(*E.g.*, *id.* § 7.5.)  It would be inappropriate to nullify or interfere with the Neutral's exercise of its judgment.

Pursuant to the Wrap Around Plan, "[e]ither Intelsat or the Objecting Retirees may suggest a potential Neutral Expert to the other."  (*Id.* § 7.3(F).)  Early on, however, *before* Intelsat even nominated a neutral, Plaintiffs' counsel, Mr. Postol, informed Intelsat's counsel (John Calandra) that he would not accept *any* neutral proposed by Intelsat.  (Calandra Decl. ¶ 11.)  That meant, unless Intelsat conceded to Plaintiffs' nominated neutral, the selection of the neutral would have to be delayed until the American Arbitration Association can open a matter, assign a Case Manager, consider party submissions, and then select among the two neutrals proposed by the sides.  (*Id.* ¶ 13.)  This delay would favor Plaintiffs because Section 7 requires the Neutral Expert to issue its decision before the Proposed Change may be implemented – a fact which Plaintiff seizes on in its Motion for Preliminary Injunction.

And Plaintiffs' concerted attacks on the neutral process only continued from there.  On October 16, 2018, *Plaintiffs* proposed Roger Burton as a Neutral Expert.  (Calandra Decl. ¶ 15.)  The following day, Intelsat sent an email to Mr. Postol with proposed language for the parties to *jointly* send to Mr. Burton and whomever Intelsat may end up proposing.  (*Id.* ¶ 16.)  Intelsat's proposed email innocuously referred the neutral to Section 7.5 as "set[ting] out in more detail the expert's task," and also inquired whether the neutral could complete the work by approximately the end of November.  (*Id.*)

Ironically, Mr. Postol responded to the draft email by improperly inserting references to "Section 5" of the Wrap Around Plan – *i.e.*, issues that *Plaintiffs* are arguing in their pending Motion for Preliminary Injunction **cannot** be decided by the Neutral Expert.  (*See* Pls. Mot. at 10.)  Mr. Postol also added text instructing the expert actuary on how to construct a

"representative sample."  (Calandra Decl. ¶ 17 & Ex. B.)  Intelsat's counsel urged a more

measured, less partisan, approach, particularly since Section 7 clearly says the "sole task" for the

Neutral is to . . . us[e] the standards and methodology set forth *in this Section 7*."  (*Id.* ¶ 21.)  As

Mr. Calandra pointed out, the "sole task" language was limited to "Section 7" – it made no

reference to Section 5.  (*Id.* ¶¶ 18, 21.)

Ultimately, the parties were able to reach agreement on a *joint* email that dropped

reference to Section 5, and included the following innocuous language:

> We are researching whether you can serve as the Neutral Expert,
> *as described in Section 7 of the Plan*.  We attach the entire Plan
> for your reference.
>
> Should you be selected as the parties' neutral, Intelsat and the
> retirees *will provide you with whatever information you deem
> necessary to complete the task* (including current utilization
> information).

(*Id.* ¶ 22) (emphasis added).

That joint email was sent to Mr. Burton, Plaintiffs' proposed neutral, on October 18 (*id.*),

and Mr. Burton responded that he would "like to serve as [the parties'] neutral expert,"

confirmed that he had no conflicts, and stated:  "We are available at this time to assist and will

remain available for this project into the foreseeable future."  (*Id.* ¶ 23.)  Intelsat's counsel wrote

an email seeking confirmation as to the deadline:  "Can you also confirm if this is a project that

you would have the time to finish by end of November?"  (*Id.* ¶ 24.)

The suggestion that the Neutral's analysis actually could be completed well in advance of

the Proposed Change implementation date apparently set off a fire storm with Plaintiffs' counsel,

as it would undermine one of his reasons for asking for a Preliminary Injunction (*i.e.*, the need to

wait for the Neutral's decision).  Despite the parties' prior agreement to send a *joint*

communication to the neutrals, Mr. Postol shot off a *substantive* reply email containing an

entirely inappropriate written inquisition into ***how the expert would perform his analysis***.  (*Id.* ¶ 26.)  He did this without first consulting with Defendants' counsel – a marked departure from how the parties had agreed to communicate with the Neutral prior to his selection.  Mr. Postol's improper "how will you" email read, in relevant part:

> Assuming you are provided the complete United Healthcare plans and all the Via Benefits Medicare Supplement, Part D and dental and vision plans, can you make the comparison?  *How* will you match which Via Benefits plan to which United Healthcare plan?  *How* will you account for the fact some of the Via Benefits plans are not available to some of the retirees, particularly on the dental side?  *How* will you account for the fact some retirees do not have Medicare Part B, since they have federal government retiree insurance or current employer insurance.  They are still covered by the United Health Plan, but Via Benefits will not cover them.

> *Will* you be able to account for the face [sic] the Medicare plans are not covered by ERISA but the United Health Care plans are?  *How* do you put a value on that, i.e. the ERISA rights for claims and appeals?

> Paragraph 7.5 Part A requires the list of in-network providers, covered pharmacies and cover drugs be comparable.  *Will* you be able to make that analysis?  *How* will you account for the fac [sic], and quantity [sic] a value for the fact, that the Via Benefits plan give no coverage of medical providers who do not take Medicare, but the United Healthcare plans do?  *Will* you look at the current retirees medical providers and see which do not take Medicare?  Intelsat in its plan says it will reimburse for prescription drugs and co-pays beyond what the current plan allows by making a taxable payment to the retirees?  Are you able to account for the fact Intelsat assumes a 15% federal tax rate and no state income tax, but for many, and likely most of the retirees that is not accurate.  *Will* you need the adjusted gross income of the retirees to do your analysis?  *How* will you account for the fact some retirees cannot afford to advance the payment of drugs and wait for Intelsat to reimburse them?  *How* will you account for any retiree who cannot advance the Via Benefits premiums and wait for Via Benefits to reimburse them from the HRA?

> Many of the Medicare Supplemental plans do not cover medical care outside the US or have a lifetime limit of $50,000 (Plan

> F). Many of the retirees are from foreign countries and travel back home frequently, and for extended periods. *How* will you get the information to account for this diminished benefit?

(*Id.*) (emphasis added). Intelsat immediately objected to this improper and obvious attempt to "voir dire" the expert seeking substantive information before he even was retained. (*Id.* ¶ 27.) Moreover, the questions contained factual inaccuracies and disputed factual assumptions. (*Id.*)

Mr. Postol's email was so far afield of actuarial standards and principles that his own proposed expert (Burton) responded in confusion:

> Some of the issues that are raised below are not easily estimable, are not typically valued in a plan comparison, and would require assigning values to not-fungible benefits.

Nonetheless, Mr. Burton confirmed that he would "review Section 7 in detail" and that he could complete the work by the end of November. (*Id.* ¶ 28.)

On October 22, 2018, with Mr. Burton's retention still unresolved, Intelsat proposed an alternative neutral expert, Adam Reese. The same initial email that was sent to Mr. Burton (*see Id*. ¶¶ 22, 29), was sent to Mr. Reese. Disregarding Intelsat's explicit request that Mr. Postol *not* send Mr. Reese the same "voir dire"-type email that was sent to Mr. Burton, Mr. Postol did exactly that. (*Id.* ¶¶ 30-31.) But despite Plaintiffs' counsel's best efforts to slow-walk the entire Neutral process, Mr. Reese *also* confirmed that he could complete the required task by the end of November, so long as he was provided data in a timely manner. (*Id.* ¶ 33.)

Most recently, after Intelsat notified Plaintiffs' counsel (Mr. Postol) that Intelsat accepted *Plaintiffs' expert* (in an effort to avoid further delay), Mr. Postol ridiculously attempted to "void" his own nominee's retention. (*Id.* ¶¶ 36, 41.) Mr. Postol did so based not on any concerns with the expert's qualifications or ability to complete the assignment, but rather because Intelsat refused to concede to Plaintiffs' unprecedented and improper demand for veto power over the materials Intelsat would submit to the Neutral Expert for review. (*Id.* ¶¶ 4, 40-41.) And in yet

another improper tactical move, Plaintiffs' counsel has now belatedly attempted to insert into the expert's engagement retention letter – which letter should normally be an inconsequential formality – eight substantive (and disputed) instructions as to how the expert *must* conduct his analysis.  (*Id.* ¶ 46 & Ex. L.)

In summary, the only thing now holding up the Neutral Expert's decision is Plaintiffs' counsel.  In his instant Motion for Directive, Plaintiffs' counsel contends that "[t]he Court is entitled to make sure the neutral expert performs his duties as section 7 of the plan requires."  (Pls. Mem. on DNE Mot. at 1.)  Plaintiffs' position (indeed, the entire Motion for Directive) is supported by just a single case – *United States v. Armour & Co.*, 402 U.S. 673 (1971).  But *Armour* is entirely inapposite and says *nothing whatsoever* about a court instructing a neutral arbitrator.  Indeed, *Armour* stands for nothing more than the unremarkable proposition that the text of a consent decree can provide a court with continuing jurisdiction to enforce the decree.  *Id.* at 676.  Notably, the *Armour* court, in exercising such jurisdiction, found there had been no violation of the consent decree at issue based on a strict reading of the decree's "four corners."  *Id.* at 682.

*Armour* provides no support for Plaintiffs' request that this Court intervene in a process that the parties delegated to an arbitrator with relevant experience.  We respectfully submit that the Neutral Expert should be allowed the freedom to do his job as he understands it and in the exercise of the actuarial principles and judgment he was given with the consent of the parties ten years ago.  If any party feels aggrieved later on, it can move to set aside the decision, the same as any party can challenge the decision of any arbitrator (and subject to the same standards).

## **CONCLUSION**

For the foregoing reasons, Plaintiffs' Motion for Preliminary Injunction should be denied.  Not only have Plaintiffs utterly failed to meet the high standard required for a preliminary

injunction, but the Court should not expend resources on reviewing a matter that has been placed

by the parties in the exclusive jurisdiction of a Neutral Expert.  Once the Neutral Expert's

decision on the validity of the Proposed Change has been made, (using his own actuarial

experience, not partisan instructions from Plaintiffs' counsel), the Preliminary Injunction motion

either will be moot or, if not, Plaintiffs will have sufficient time to return to this Court for further

relief, but that further relief will be damages, not a preliminary injunction.

Plaintiffs' Motion for Directive to the Neutral Expert should be denied as well, as an

unwarranted and unprecedented intrusion into matters (and expertise) committed to the exclusive

jurisdiction of an arbitrator.  The only "instructions" needed here should be directed to Plaintiffs'

counsel to stop interfering with the Neutral Expert process and to let Mr. Burton go ahead and do

his job.

Dated: November 5, 2018　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　/s/ *Michael S. Nadel*
　　　　　　　　　　　　　　　　Michael S. Nadel (D.C. Bar No. 470144)
　　　　　　　　　　　　　　　　Jennifer B. Routh (D.C. Bar No. 1032060)
　　　　　　　　　　　　　　　　MCDERMOTT WILL & EMERY LLP
　　　　　　　　　　　　　　　　500 North Capitol Street, N.W.
　　　　　　　　　　　　　　　　Washington, D.C.  20001
　　　　　　　　　　　　　　　　(202) 756-8000

　　　　　　　　　　　　　　　　John J. Calandra (*pro hac vice* motion pending)
　　　　　　　　　　　　　　　　Lisa A. Gerson (*pro hac vice* motion pending)
　　　　　　　　　　　　　　　　340 Madison Avenue
　　　　　　　　　　　　　　　　New York, New York  10173
　　　　　　　　　　　　　　　　(212) 547-5400

　　　　　　　　　　　　　　　　John P. Hendrickson  (*pro hac vice* motion pending)
　　　　　　　　　　　　　　　　444 West Lake Street
　　　　　　　　　　　　　　　　Chicago, Illinois  60606
　　　　　　　　　　　　　　　　(312) 372-2000

　　　　　　　　　　　　　　　　*Counsel for Defendants Intelsat Global Services LLC,*
　　　　　　　　　　　　　　　　*Administrator, Intelsat Services Medical Benefits Plan, and*
　　　　　　　　　　　　　　　　*Intelsat S.A*